BC

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

RECEIVED
JXM
3/6/2024
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

    1.   This main document contains less than 14,000 words. The attachments contain less than 3,000 words.

    2.   This document has been prepared in a proportionally spaced typeface using Google Docs word processing program, using type Times New Roman style in size 14 font

C (s)_____

**Jorge Alejandro III RODRIGUEZ MORENO**

Dated: March 6th, 2024

# IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **Jorge Alejandro III RODRIGUEZ MORENO**<br><br>**Referred to as "Lead Plaintiff" or "Plaintiff"**<br><br>**Plaintiff,** | 1:24-cv-01905<br>Judge Jeremy C. Daniel<br>Magistrate Judge Jeannice W. Appenteng<br>CAT. 2 / RANDOM |
| **v.** | **Case No:** |

| | |
|---|---|
| **DMG AMERICA INC.**<br><br>**DMG MORI AMERICAS HOLDING CORPORATION**<br><br>**DMG MORI USA, INC.**<br><br>**DMG MORI USA SALES, INC.**<br><br>    **Collectively "DMG Mori" , "Defendant" or "Defendants"**<br><br>**Collectively "DMG Mori Executives","DMG Executives" or "Executives"**<br><br><br>    **Defendants** | **COMPLAINT FOR BREACH OF CONTRACT, FRAUDULENT CONCEALMENT, UNJUST ENRICHMENT AND OTHER CAUSES.** |

## TABLE OF CONTENTS

| | |
|---|---|
| Certificate of Compliance With Type-Volume Limit | 1 |
| File for **COMPLAINT FOR BREACH OF CONTRACT, FRAUDULENT CONCEALMENT, UNJUST ENRICHMENT AND OTHER CAUSES.** | 2 |
| TABLE OF CONTENTS | 6 |
| TABLE OF AUTHORITIES | 8 |
| INTRODUCTORY STATEMENT | 10 |
| **CLAIMS FOR RELIEF** | 17 |
| STATEMENT OF THE IDENTITY OF THE PLAINTIFFS, OUR  INTEREST IN THE CASE, AND THE SOURCE OF OUR AUTHORITY TO FILE | 19 |
| APPLICABLE LAW, JURISDICTION AND VENUE | 20 |
| Applicable Law | 20 |
| Jurisdiction and Venue. | 22 |
| THE PARTIES | 24 |
| Plaintiffs | 24 |
| Defendants | 24 |
| Co Conspirators | 27 |
| SUMMARY OF ARGUMENT AND ARGUMENT | 30 |
| TOLLING AND SUSPENSION OF THE STATUTES OF LIMITATION | 59 |
| LEGAL ALLEGATIONS AND CAUSE OF ACTION | 62 |

| | |
|---|---|
| FIRST CAUSE OF ACTION - Contractual | 64 |
| SECOND CAUSE OF ACTION-Tort-related causes of action | 65 |
| THIRD CAUSE OF ACTION - Precedent causes of action | 68 |
| FOURTH CAUSE OF ACTION (Equity-related causes of action) | 69 |
| FRAUDULENT CONCEALMENT | 70 |
| DAMAGES | 71 |
| JURY TRIAL DEMAND | 73 |
| PRAYER FOR RELIEF | 73 |
| PROPOSED ORDER | 76 |
| List, identification and standing of Plaintiffs. List of other entities and acronym | 80 - Attachment I |

## TABLE OF AUTHORITIES

**Federal Cases**

1. Cuba R. Co. v. Crosby, 222 U.S. 473 (1912)

2. Slater v. Mexican National R. Co., 194 U. S. 120, 194 U. S. 126.

3. American Banana Co. v. United Fruit Co., 213 U. S. 347, 213 U. S. 356.

4. Bean v. Morris, 221 U. S. 485, 221 U. S. 486-487.

5. Comm. of Blind Vendors v. District of Columbia, Civ. A. No. 88-0412-OG on the "continuing wrong doctrine"

6. Syms v. Olin Corp., 408 F.3d 95, 108 (2d Cir. 2005). on the "continuing tort doctrine,"

7. National RR Passenger Corp. v. Moigan, 536 U.S. 101, 110, 114 (2002) on "continuing violation doctrine" and "continuing violations doctrine".

8. 114 F. Supp. 2d 117, 134-35 (E.D.N.Y 2000)

**Rules**

1. Federal Rule of Civil Procedure 4(k); Federal Rule of Civil Procedure 44.1

2. 28 U.S.C. § 1332

3. 28 U.S.C. § 1391(b) ; 28 U.S.C. § 1391(b)(2) ; 28 U.S.C. § 1391(f)(3)..

4. Del. C. § 321(a), 10

5. Del. C. § 3111

**Foreign Laws**

1. Switzerland Private International Law Act. (PILA)

2. Switzerland Civil Code (ZG)

3. Switzerland  Code of Civil Procedure (ZPO)

4. Venezuela Code of Commerce (VCC)

1.   **INTRODUCTORY STATEMENT**

2.   This concerns the breach of contract and damages by DMG Mori towards **Lead Plaintiff** fully identified in Attachment 1, in his duties as agent and representative of DMG Mori in Venezuela, Guyana and Trinidad and Tobago; collectively referred to as "the countries".

3.   From October 2008 and in the years 2009, 2010, 2011, 2012, 2013, 2014, Mr. Lead Plaintiff, as agent and representative of DMG, took care of sales, service, promotion, representation, purchase, resale, service, installation etc. of DMG MORI products and services in "the countries".

4.   Mr. Lead Plaintiff had the technical and sales staff of his customers and his contractors trained in the use, service, sale, etc. of DMG MORI equipment by having them attend training courses organized by DMG MORI. Additional training was also provided by Mr. Lead Plaintiff with local Venezuelan  companies. These seminars and training courses took place in Germany, Switzerland, Brazil, the USA and China.

5.   Mr. Lead Plaintiff pursuant to the contracts and agreements with DMG Mori; with his own funds or through contracts with other companies or individuals, instructions to other companies or individuals and similar measures to establish the necessary business activities necessary for the promotion,   sale    and    service    of    equipment    manufactured    and

manufactured by DMG MORI be marketed. These activities included private individuals (individuals) and companies as well as other artificial entities. Mr. Lead Plaintiff and DMG Mori attended meetings with public and private financial institutions with clients in Venezuela and Colombia.

6.    In those years, Mr. Lead Plaintiff sold DMG Mori machines to the customers through the representation in the countries.

7.    During these years, Mr. Lead Plaintiff (on the recommendation and promise of future DMG Mori service and repair business) purchased several machines manufactured by DMG Mori from private vendors in order to increase sales of spare parts, accessories and various services offered by DMG Mori.

8.    DMG Mori has not fulfilled orders issued by Mr. Lead Plaintiff and accepted by DMG Mori (D-161, D-162, D-163, D-164, D-165, D-166). DMG Mori has fulfilled its contractual obligations in relation to representation, sale, delivery and representation with Mr. Lead Plaintiff in accordance with the Swiss Code of Obligations for commercial agency contracts (Art. 394. ZGB. etc.)

9.    DMG Mori sold a defective machine to Mr. Lead Plaintiff, additionally without manuals, resulting in over $5,000.00 being incurred to purchase those manuals and make the necessary repairs; DMG Mori offered Mr.

Lead Plaintiff that he would be paid for future sales from the agency agreement in the countries. This compensation never accrued.

10.    DMG Mori has not delivered the machines ordered by Mr. Lead Plaintiff in the above orders (orders D-161-11, D-162-11, D-163-11, D-164-11, D-165 -11, D-166-11) . See Attachment III

11.    In relation to the agreed terms of the contract relating to the sale and delivery of a DMU-200P as agreed by DMG with Mr. Lead Plaintiff, they have not been complied with by DMG. DMG Mori has made extremely harmful and unlawful false statements to Mr. Lead Plaintiff, financial institutions, officials, the end customer and other potential customers of this type of equipment. Mr. Lead Plaintiff became aware of DMG Mori's misrepresentations at the time of the actual breach of contract. DMG Mori fraudulently lied about the export insurance of the machines and the deposit procedure. **See Attachment II.**

12.    DMG Mori caused Mr. Lead Plaintiff a loss of over $9,500.00 when DMG increased the agreed and contracted sale price of a machine after Mr. Lead Plaintiff confirmed to the customer a lower purchase price at a price quoted by Mr. Lead Plaintiff had . Lead Plaintiff had to honor the price and conditions previously offered by DMG Mori to avoid further damage to his business and reputation. DMG Mori offered Mr. Lead

Plaintiff that he would be paid for future sales from the agency agreement in the countries. This compensation never accrued.

13. DMG Mori supplied Mr. Lead Plaintiff with a machine with incorrect specifications which rendered it unusable for almost a year. Furthermore, the alleged machine was not only technically defective, but was used under conditions that clearly indicate that DMG Mori was fully aware of the machine's inability to perform any type of work. In this case, due to the negligence and misconduct of DMG Mori, Mr. Lead Plaintiff had to bear expenses for the work of several technicians and spare parts. In this case too, production losses were caused by negligence and misconduct on the part of DMG MORI. DMG Mori offered Mr. Lead Plaintiff that he would be paid for future sales from the agency agreement in the countries. This compensation never accrued.

14. DMG Mori sold spare parts and technical training equipment to Mr. Lead Plaintiff at unlawfully inflated prices, failing to honor previous firm offers and contract terms.

15. At all times Mr. Lead Plaintiff acted in good faith.

16. Furthermore, Mr. Lead Plaintiff has been greatly affected by DMG's unlawful actions as several customers are canceling orders due to the

faulty machines supplied by DMG and due to the orders not fulfilled by DMG.

17.   These damages are Mr. JAR according to the Swiss Code of Obligations on the provisions for agency contracts, third section: the brokerage contract, Art. 412 and following.

18.   A series of phone, letter and email negotiations promising solutions from DMG Mori still ensued until the end of 2014 when the breach of contract fully materialised, when it became clear to Mr Lead Plaintiff that DMG Mori did not intend to fulfill the due contractual obligations.

19.   On several of these trips, Mr. Lead Plaintiff had to cover the travel expenses of several people.

20.   In order to be able to fulfill these duties, Lead Plaintiff undertook a large number of international trips from Venezuela to Switzerland, and to Germany to meet with DMG management and discuss how to rectify DMG's misconduct. This involved several trips from Venezuela to Brazil and the United States of America. In several cases, these travel expenses related to clients of Mr. Lead Plaintiff. On some of these trips, due to the complexity of the issues discussed, Mr. Lead Plaintiff had to pay for the travel expenses of sales representatives and technicians traveling with

him. These expenses are Lead Plaintiff according to the federal law of the Swiss Civil Code, Art. 418.

21. **On the week of March 8th, 2013, DMG Mori sent a representative to visit Lead Plaintiff in Venezuela in order to discuss all pending issues with regards to the failure of DMG to comply with the obligations mentioned in this complaint and other additional wrongs performed by DMG Mori. It was agreed, in writing, that DMG would solve the pending issues in a proper, amicable and satisfactory manner for Lead Plaintiff and the final users. It was agreed in writing that in one year's time from the date of such agreement that the pending issues would be solved by DMG Mori in a satisfactory manner. Lead Plaintiff offered full collaboration for this.**

22. The discussed issues were summarized as:

23. DMG Mori sold a defective machine to Mr. Rodriguez without manuals causing it to incur over $5,000.00 to purchase said manuals and effect the necessary repairs; DMG Mori was requested and so accepted to compensate by discounting on the price of any spare parts required in the future for such machine.

24. DMG Mori failed to deliver machines ordered by Mr. Lead Plaintiff and/or his customers in the above mentioned purchase orders and given

the complexity of the case involving several foreign subsidiaries of DMG (DMG CoConspirators) it was agreed that such case would be dealt and solved in the coming Trade Show of Hannover Messe 2013 to be held in Hannover, Germany, from 16th to 21st September 2013;

25.    As DMG failed to honor several contracts offered to a customer of Mr. Lead Plaintiff, Mecanica 200 Taco/GEARCA, CVP (Cooperativa Venezolana de Producción), Intramaq, among others, and given the complexity of the case involving several subsidiaries of DMG Mori. DMG Mori caused a loss of over $9,500.00 to Mr. Rodriguez when DMG Mori raised the purchase price of a machine once Mr. Rodriguez had confirmed a lower purchase price with his client, DMG Mori was requested and so accepted to compensate by collaborating with marketing and advertising material up to such amount in the next year (2024).

26.    DMG Mori delivered a faulty machine containing the wrong specifications. In this case DMG Mori acted with willful fraudulent concealment and bad faith as it will be evidenced, as DMG Mori was aware the machine did not and could not work as intended, or even more, could not work at all ;

27.    DMG Mori has sold spare parts to Mr. Lead Plaintiff at increased prices.

28.    At all times material, Mr. Lead Plaintiff has acted in good faith.

29.     The same cannot be said about DMG. Not only has DMG sold defective machines and failed to deliver the same but it has also made fraudulent misrepresentations to Mr. Lead Plaintiff and his customers. Specifically, DMG fraudulently misrepresented that the order and contract pertaining to customer Mecanica 200  Taco/Gearca could not be honored in the promised terms because DMG had allegedly not received the approval for the APG export insurance, when DMG had knowledge this export insurance had already been granted. Customers of Mr. Rodriguez are not to  pay or be penalized for machines that  were never delivered, do not come with the required specifications, or that do not work as intended. Further, the excellent reputation of Mr. Lead Plaintiff has been tremendously affected by DMG's bad faith since different customers have canceled several orders, due to the defective machinery delivered by DMG and to the orders unfulfilled  by DMG. Similar case occurred with the pre-booking of a DMU-125P machine.

30.     **STATEMENT OF THE IDENTITY OF THE PLAINTIFFS, OUR INTEREST IN THE CASE, AND THE SOURCE OF OUR AUTHORITY TO FILE**

31.     I, as Plaintiff state as follows:

14

32. Identity of Plaintiffs, interest in the case and source of authority to file are stated in Appendix I and considered hereby reproduced.

33. I pray the honorable court for the seal and reserve of my identity with regards to the public on the grounds of personal and family danger in my homeland.

**34. APPLICABLE LAW, JURISDICTION AND VENUE**

**35. Applicable Law**

36. Procedural Law is that of the State of Illinois under Federal Rules of Civil Procedure.

37. Under FRCP 44.1 ; Del. Cod. C. Proc. 44.1; Plaintiffs pray the court to rule that applicable Law is the Law of the country of Venezuela, as in the context of federal court proceedings, Federal Rule of Civil Procedure 44.1 ("Rule 44.1") provides procedural guidance for the application of foreign law in federal court. Rule 44.1 states that:

38. **"[a] party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law. "**

39. It has been recognized that when an action is brought upon a cause arising outside of the jurisdiction, it always should be borne in mind that the duty of the court is not to administer its notion of justice, but to enforce an obligation that has been created by a different law. *Cuba R. Co. v. Crosby, 222 U.S. 473 (1912); Slater v. Mexican National R. Co., 194 U. S. 120, 194 U. S. 126.* With very rare exceptions, the liabilities of parties to each other are fixed by the law of the territorial jurisdiction within which the wrong is done and the parties are at the time of doing it. *American Banana Co. v. United Fruit Co., 213 U. S. 347, 213 U. S. 356. See Bean v. Morris, 221 U. S. 485, 221 U. S. 486-487.*, federal courts sitting in diversity apply the federal rule so long as it does not violate the Rules Enabling Act, 28 U.S.C. § 2072, by abridging, enlarging or modifying any substantive right–including substantive rights guaranteed under state law.

So in this case as most of the obligations were created in the territory of the Bolivarian Republic of Venezuela (Venezuela), the performance of contracts in most of its part was in Venezuela, that for several of the contracts related to these claims the Defendants regognized and contracted in writing specifically under Venezuelan law, the Plaintiff prays the court that Venezuelan law be the applicable law.

If eventually the court is to consider that another law is to be applicable, the Plaintiff respectfully prays for the consideration of the Swiss Law, based on the fact that the company in charge of the DMG Mori conglomerate, DMG Mori AG, has its sit in the city of Winterthur, Switzerland, that a number of meetings related to the issues of the case were held in Switzerland, that the leading executives of the DMG Mori AG (based in Switzerland) have been the same directors of the other companies of the conglomerate which makes them indistinguishable from one duty to the other.

Additionally the Plaintiff has his domicile in Switzerland in the condition of political assylant, with the rights and duties specified in the international treaties to which the United States and Switzerland have agreed with regards to such residents.

40. In the eventuality the Court considers that it is the law of the country with more connections to the issues, specially to the wrongs exerted against a party, the Lead Plaintiff in this case, the Lead Plaintiff prays in law and equity that Venezuelan Law be applied.

41. Plaintiffs bring to the attention of the Court that both Switzerland and Venezuela are bound by a number of international agreements with regards to international trade and commerce to which the US is also part.

42.     As well as provided in Article 32 of the Swiss Private International Law Act, which states:

43.     *Art. 24*

44.     *1 A person is considered to be stateless when they are recognised as such pursuant to the New York Convention of 28 September 195421 Relating to the Status of Stateless Persons, or when such person's relationship to their national state is severed to such an extent that their situation is equivalent to that of a stateless person.*

45.     *2 A person is deemed to be a refugee when they are recognised as such pursuant to the Asylum Act of 5 October 197922. 3 Where this Act applies to stateless persons and to refugees, domicile replaces citizenship*

46.     ***Swiss Federal Act on Private International Law (PILA) of 18 December 1987 (Status as of 1 February 2021)***

47.     **Jurisdiction and Venue.**

48.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, which provides that federal courts have jurisdiction over civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. Plaintiff has domicile in Switzerland and injuries, breach of contract and other wrongs were performed  mainly by the Defendants

in Venezuela and Germany. Defendants are residents and domiciled in the U.S., Switzerland and Germany. (Attachment I).

**49.** **Defendants:**

50.    The Court also has personal jurisdiction over the Defendants. Several of the defendants have their main operation in the State of Illinois and have sufficient contacts with the State of Illinois to establish personal jurisdiction. Additionally the jurisdiction of this honorable court upon several of the Defendants has been exerted in recent cases brought to the court.

51.    Venue is proper in this Court under 28 U.S.C. § 1391(b) as Defendant resides in  this District. Further, a substantial part of the events or omissions giving rise to the claim herein  occurred in this District.

52.    Venue is proper in this action pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(f)(3).. Defendants are subject to personal jurisdiction in the State of Illinois and a substantial part of property that is subject of the action is situated in the State of Illinois.

53.    Personal jurisdiction in this District is proper over Defendant pursuant to Del. C. § 321(a), 10 Del. C. § 3111, and Federal Rule of Civil Procedure 4(k).

54.    A proposed order is attached to this brief.

**55.  CLAIMS FOR RELIEF**

56.  The Plaintiffs seek to  be awarded restitution, including disgorgement of profits obtained by Defendant as a result of their acts of unjust enrichment, or any acts in violation of laws of fiduciary duties; That Plaintiffs be awarded their damages, in an amount according to injury.

57.  That Plaintiffs be awarded proper interest for damages after the date determined by the court;

58.  That Plaintiffs recover their costs of suit including translation costs, accountants, financial and other advisors costs and reasonable attorney's fees; and

59.  That the Court grant other legal and equitable relief as it may deem just and proper under the circumstances, including such other relief as the Court may deem just and proper to redress, and prevent recurrence of, the alleged violation to dissipate the effects of Defendant's violations.

60.  Order Defendants to pay damages to Plaintiffs in an amount to be determined during the process; and grant such other relief as the Court may deem just and equitable.

61.  Award exemplary damages to Lead Plaintiff for the intentional wrongdoings of DMG Mori.

62.  The Plaintiff seeks monetary relief of over $ 1,200,000.

63.  **THE PARTIES**

64.  Plaintiffs

65.  Mr. Lead Plaintiff, Venezuelan citizen domiciled in the canton of Zug in Switzerland, claiming in his former duties as agent and representative of DMG Mori in Venezuela and other South American countries; collectively referred to as "the countries" and as assignee of claims from several end users in Venezuela wronged by Defendants.

66.  **Defendants:**

67.  **DMG AMERICA INC., DMG MORI AMERICAS HOLDING CORPORATION, DMG MORI USA, INC.; DMG MORI USA SALES, INC.** are established in Delaware with their commercial operations in all states of the United States. Therefore, the Court has territorial and subject matter jurisdiction over this action.

68.  **DMG AMERICA INC.** a corporation with its headquarters and main operations in 2400 Huntington Blvd Hoffman Estates, IL, 60192-1564 United States

69.  **DMG MORI AMERICAS HOLDING CORPORATION,** a corporation with its headquarters and main operations in 2400 Huntington Blvd Hoffman Estates, IL, 60192-1564 United States

70.  **DMG MORI USA, INC.** a corporation with its headquarters and main operations in 2400 Huntington Blvd Hoffman Estates, IL, 60192-1564 United States

71. **DMG MORI USA SALES, INC.** a corporation with its headquarters and main operations in 2400 Huntington Blvd Hoffman Estates, IL, 60192-1564 United States

72. **DECKEL MAHO Inc.** a corporation with its headquarters and main operations in 2400 Huntington Blvd Hoffman Estates, IL, 60192-1564 United States

73. **CoConspirators:**

74. **CoConspirator 1: DMG Mori Sales and Service Holding AG- (before DMG Mori AG). domiciled in Sulzer-Allee 70**

75. **CH-8404  Winterthur**

76. **CoConspirator 2: DECKEL MAHO Pfronten GmbH - Germany.**  a Limited Liability Corporation incorporated under German law with its headquarters and main operations in Deckel-Maho-Str. 1, 87459 Pfronten, Germany

77. **CoConspirator 3: DMG Mori AG - Switzerland**   a corporation with its headquarters and main operations in Sulzerallee 70 · 8404 Winterthur , responsible for the worldwide management of the DMG conglomerate according to its statutes.

78. **CoConspirator 4: DMG MORI Brasil Com. de Equips. Industriais Ltda. - Brazil.** a corporation with its headquarters and main operations in Rua Jalil Abib, 60B - Éden BR-18087-107 – Sorocaba, SP, Brazil

79. **CoConspirator 5: Rajeev Anand - Chief Financial Officer DMG Mori AG -** A British citizen with correspondence address Brandon House, 90 The Broadway, Chesham, England, HP5 1EG

80. **CoConspirator 6: Decio Lima -** A Brazilian citizen with correspondence address in Rua Anuar Dequech, 770, Iporanga 18087-157 SOROCABA - SP, Brazil

81. **CoConspirator 7: Henri Gouffaux - A Swiss citizen**

82. **CoConspirator 8: Thorsten Schmidt - A German citizen**

83. **CoConspirator 9: Rainer Keller - A German citizen**

84. **PLUSTECH INDUSTRIA E COMERCIO EIRELI - Brazil**. a corporation with its headquarters and main operations in Rua Anuar Dequech, 770, Iporanga 18087-157 SOROCABA - SP

85. **Thorsten Schmidt -** A German citizen with correspondence address

86. **SUMMARY OF ARGUMENT AND ARGUMENT**

87. All facts and allegations are based on information and belief.

88. This concerns the breach of contract by DMG Mori towards Mr. Lead Plaintiff, Venezuelan citizen domiciled in the canton of Zug in Switzerland, in his duties as agent and representative of DMG Mori in Venezuela and other South American countries; collectively referred to as "the countries".

89. From October 2008 and in the years 2009, 2010, 2011, 2012, 2013, 2014, Mr. Lead Plaintiff, as agent and representative of DMG, took care of sales, service, promotion, representation, purchase, resale, service, installation etc. of DMG MORI products and services in "the countries".

90. Mr. Lead Plaintiff had the technical and sales staff of his customers and his contractors trained in the use, service, sale, etc. of DMG MORI equipment by having them attend training courses organized by DMG MORI. Additional training was also provided by Mr. Lead Plaintiff with local Venezuelan and Colombian companies. These seminars and training courses took place in Germany, Switzerland, Brazil, the USA and China.

91. Mr. Lead Plaintiff pursuant to the contracts and agreements with DMG Mori; with its own funds or through contracts with other companies or individuals, instructions to other companies or individuals and similar measures to establish the necessary business activities necessary for the promotion, sale and service of equipment manufactured and manufactured by DMG MORI be marketed. These activities included not only private individuals (individuals) and companies (legal entities), but also Venezuelan and Colombian governmental organizations. DMG Mori's involvement in meetings with government officials and

government institutions in Venezuela and Colombia also included state-owned financial institutions. Mr. Lead Plaintiff and DMG Mori attended meetings with public and private financial institutions with clients in Venezuela and Colombia.

92. In those years, Mr. Lead Plaintiff sold DMG Mori machines to the customer through the representation in the countries.

93. During these years, Mr. Lead Plaintiff (on the recommendation and promise of future DMG Mori service and repair business) purchased several machines manufactured by DMG Mori from private vendors in order to increase sales of spare parts, accessories and various services offered by DMG Mori.

94. DMG Mori has not fulfilled orders issued by Mr. Lead Plaintiff and accepted by DMG Mori (D-161, D-162, D-163, D-164, D-165, D-166). DMG Mori has fulfilled its contractual obligations in relation to representation, sale, delivery and representation with Mr. Lead Plaintiff in accordance with the Swiss Code of Obligations for commercial agency contracts (Art. 394. ZGB. etc.)

95. DMG Mori sold a defective machine to Mr. Lead Plaintiff, additionally without manuals, resulting in over $5,000.00 being incurred to purchase those manuals and make the necessary repairs; DMG Mori offered Mr.

Lead Plaintiff that he would be paid for future sales from the agency agreement in the countries. This compensation never accrued.

96.  DMG Mori has not delivered the machines ordered by Mr. Lead Plaintiff in the above orders (orders D-161-11, D-162-11, D-163-11, D-164-11, D-165 -11, D-166-11) .

97.  In relation to the agreed terms of the contract relating to the sale and delivery of a DMU-200P as agreed by DMG with Mr. Lead Plaintiff, they have not been complied with by DMG. DMG Mori has made extremely harmful and unlawful false statements to Mr. Lead Plaintiff, financial institutions, government officials, the end customer and other potential customers of this type of equipment. Mr. Lead Plaintiff became aware of DMG's misrepresentations at the time of the actual breach of contract. DMG lied about the export insurance of the machines and the deposit procedure. Also,

98.  In relation to the agreed terms of the contract relating to the sale and delivery of a DMU-125P as agreed by DMG with Mr. Lead Plaintiff, they have not been complied with by DMG. DMG Mori has made extremely harmful and unlawful false statements to Mr. Lead Plaintiff, financial institutions, government officials, the end customer and other potential customers of this type of equipment. Mr. Lead Plaintiff became aware of

DMG's misrepresentations at the time of the actual breach of contract. DMG lied about the export insurance of the machines and the deposit procedure. Also, ..

99.     DMG Mori caused Mr. Lead Plaintiff a loss of over $9,500.00 when DMG increased the agreed and contracted sale price of a machine after Mr. Lead Plaintiff confirmed to the customer a lower purchase price at a price quoted by Mr. Lead Plaintiff had . Lead Plaintiff had to honor the price and conditions previously offered by DMG Mori to avoid further damage to his business and reputation. DMG Mori offered Mr. Lead Plaintiff that he would be paid for future sales from the agency agreement in the countries. This compensation never accrued.

100.    DMG Mori supplied Mr. Lead Plaintiff with a machine with incorrect specifications which rendered it unusable for almost a year. Furthermore, the alleged machine was not only technically defective, but was used under conditions that clearly indicate that DMG Mori was fully aware of the machine's inability to perform any type of work. In this case, due to the negligence and misconduct of DMG Mori, Mr. Lead Plaintiff had to bear expenses for the work of several technicians and spare parts. In this case too, production losses were caused by negligence and misconduct on the part of DMG MORI. DMG Mori offered Mr. Lead Plaintiff that he

would be paid for future sales from the agency agreement in the countries. This compensation never accrued.

101. DMG Mori sold spare parts and technical training equipment to Mr. Lead Plaintiff at unlawfully inflated prices, failing to honor previous firm offers and contract terms.

102. At all times Mr. Lead Plaintiff has acted in good faith.

103. Furthermore, Mr. Lead Plaintiff has been greatly affected by DMG's unlawful actions as several customers are canceling orders due to the faulty machines supplied by DMG and due to the orders not fulfilled by DMG.

104. These damages are Mr. JAR according to the Swiss Code of Obligations on the provisions for agency contracts, third section: the brokerage contract, Art. 412 and following.

**105. On or about june 2013, Lead Plaintiff met with senior management of Defendants in the Illinois Sales Headquarters for the americas in order to discuss the issue. To the anointment of Plaintiff they expressed to be surprised and asked for time to "understand the issue" while at the same time made a settlement offer for another case totally unrelated to the issues under consideration. It was agreed that parties would meet again in September 2013 in Europe in order to**

**review the cases. It was so agreed and the Plaintiff so performed, incurring in a number of expenses that time proved totally unnecessary as it became clear DMG Mori had no intention of honoring any of its previous agreements.**

106. A series of phone, letter and email negotiations promising solutions from DMG Mori still ensued until 2014 when the breach of contract fully materialised, when it became clear to Mr Lead Plaintiff that DMG Mori did not intend had to fulfill the due contractual obligations.

107. On several of these trips, Mr. Lead Plaintiff had to cover the travel expenses of several people, which became onem value not yet quantified and paid by DMG Mori to Mr. Lead Plaintiff.

108. In order to be able to fulfill these duties, **Lead Plaintiff** undertook a large number of international trips from Venezuela to Switzerland, and to Germany to meet with DMG management and discuss how to rectify DMG's misconduct. This involved several trips from Venezuela to Brazil and the United States of America. In several cases, these travel expenses related to clients of Mr. Lead Plaintiff. On some of these trips, due to the complexity of the issues discussed, Mr. Lead Plaintiff had to pay for the travel expenses of sales representatives and technicians traveling with

him. These expenses are **Lead Plaintiff** according to the federal law of the Swiss Civil Code, Art. 418.

## 109.  TOLLING AND SUSPENSION OF THE STATUTES OF LIMITATION

110.  Extraordinary circumstances of Plaintiff are explained as follows:

111.  Under the "continuing violations doctrine"' after Bodner v. Banque Paribas it is clear that not even the passage of several decades between the seizures and the institution of the plaintiffs' lawsuit  dictate for dismissal of the claims pursuant to the applicable statute of limitations. In Bodner v. Paribas and to the defendants' surprise and chagrin, the court determined that if the plaintiffs' allegations were true, the statute of limitations had not yet even begun to run on their claims.  Instead, the defendants' allegedly ongoing refusal to pay the claimants proper compensation, return seized property and return confiscated or wrongfully appropriated money  represent a "continuing violation" of international law that persisted up through the time of suit. The continuing violations doctrine thus breathed new life into claims that otherwise might have accrued and expired more than a half-century earlier. The basic theory behind the continuing violations doctrine is that in some situations, continuing misconduct by a defendant will justify the aggregation or parsing of its

misbehavior, with the effect of rescuing a plaintiff's claim or claims from the statute of limitations. Yet this seemingly straightforward principle has frustrated judges and litigants for many years, for it has proven exceedingly difficult to determine which claims are "continuing" in nature, and which are not. The United States Supreme Court has stepped in to provide guidance as to specific causes of action, as it did this past term in a Title VII case, Ledbetter v. Goodyear Tire & Rubber Co. Plaintiffs allege and count on the favorable opinion of the court that, in addition to any statute of limitation provision, this case fulfills the criteria for tolling any statute of limitations that would be applicable in ordinary circumstances on the "continuing tort doctrine", "continuing wrong doctrine" or "continuing violations doctrine" as expressed in Syms v. Olin Corp., 408 F.3d 95, 108 (2d Cir. 2005). on the "continuing tort doctrine," and National RR Passenger Corp. v. Moigan, 536 U.S. 101, 110, 114 (2002) on "continuing violation doctrine" and "continuing violations doctrine".

112.    So under the doctrine the action and due to the continuing violation and fraudulent concealment performed by Defendant, the complaint is not time barred.

113.    In addition **extraordinary circumstances have also been found when the political climate of a country made the safe initiation of a lawsuit impossible, although the plaintiff is required to file the lawsuit within a reasonable time after the extraordinary circumstances are removed. Lead Plaintiff has been under an ever increasing political persecution since at least 2002, with intervals of more or less intensity, peaking from 2015 to 2019 and ending in his exile to Europe where he is a political assylant in a German speaking country since 2019.**

114.    The extraordinary circumstances required for   equitable tolling are assessed on a case by case basis, but include "situations where the defendant misleads the plaintiff, allowing the statutory period to lapse; or when the plaintiff has no reasonable way of  discovering the wrong perpetrated against her. . . ."

115.    Lead Plaintiff has been persecuted by the Venezuelan government for several years, which had a direct effect in any possibility for the Plaintiff to move forward with the legal claim. Conditions of health, persecution on political grounds and hardship made it unfeasible to proceed in court actions any time before. The unequality of arms, which is evident in this case, would have been unsurmountable for Plaintiff in a previous moment

as changes of residence, a chronic health situation impeding proper legal action and hardship call for equitable tolling. It is brought to the attention of the court that since November 2019 in exile under the protection of the Swiss Confederation as political assylant.

116. All the above circumstances, additional to the fact that Lead Plaintiff has been active in meetings and discussions with DMG Mori in Switzerland on this issue as recent as early 2023, having requested mediation through official court, all are respectfully brought to the court in order to dispense any time barring consideration and dismiss any such claim from Defendants.

## 117. LEGAL ALLEGATIONS AND CAUSE OF ACTION

118. The Lead Plaintiff alleges the following.

## 119. ALLEGATIONS

120. Plaintiffs file this action with standing as follows:

121. Defendant DMG America, DMG Pfronten, and other subsidiaries were unjustly enriched to the detriment of Plaintiff, entitling Plaintiffs to disgorgement of all monies resulting therefrom; and as Plaintiff is entitled to restitution and/or disgorgement, in addition to, or as a substitute for, damages under applicable US, Venezuelan and Swiss law.

122. The claims of the Plaintiff are legitimate as Plaintiff was injured, by Defendants and co-conspirators' unlawful and inequitable methods, acts, and practices, i.e., they performed sustainable damage to the Plaintiff until the termination of the agency agreement and even further.

**123. FIRST CAUSE OF ACTION - Contractual**

124. DMG Mori has not fulfilled orders issued by Mr. Jorge Alejandro Rodriguez and accepted by DMG Mori (D-161, D-162, D-163, D-164, D-165, D-166). DMG Mori has fulfilled its contractual obligations in relation to representation, sale, delivery and representation with Plaintiff in accordance with the Chapter IV of the Venezuelan Code of Commerce and the corresponding Swiss Code of Obligations for commercial agency contracts (Art. 394. ZGB. etc.)

125. Defendants violated the written contracts with Plaintiffs by *De facto* actions. Contracts were De facto terminated and compensation, commissions, due benefits, etc. were not paid.

126. Breach of contract: DMG companies clearly failed to perform their obligations. Plaintiff alleges and will beyond doubt establish the existence of valid contracts, their own performance and readiness to perform as well as the defendant's failure to perform, and resulting damages. Plaintiff alleges that DMG breached their contracts by failing to provide the

equipments as agreed; failed to pay due invoices and proceeded on termination of contracts without just cause and without compensation to the Plaintiff and other wronged parties, not paying proper commissions to Plaintiff.

127. In summary with regards with the First Cause of Action the following assertions are made against defendants:

128. Breach of Contract:

129. Anticipatory Breach: DMG, in a *De facto* way communicated its intention to not fulfill contractual duties before and after the performance was due in the case of agreed and contracted purchase orders, service orders and maintenance orders from Plaintiff. This gives the Plaintiff the right to treat the contract as breached and pursue legal remedies for each of the breached contracts.

130. As remedy, monetary damages are to be provided to Plaintiff in order to restore the economic capacity of Plaintiff.

131. So as the Plaintiff states this claim for damages on breach of contract by Defendants within proper time and asks for proper redress Chapter IV of the Venezuelan Code of Commerce and the corresponding Swiss Code of Obligations for commercial agency contracts .

**132. SECOND CAUSE OF ACTION-Tort-related causes of action**

133.    Fraudulent misrepresentation,

134.    The Defendant  DMG America made a false representation regarding several material facts on which the Plaintiff relied. Some of the facts fraudulently represented by the Defendants include the promise of fair treatment of the cases at a later date, the promise of compensation for changes in prices, quality, characteristics of offered or delivered equipment, or the promise of returning or repairing the damaged property, and other well documented facts. The case of fraud against customer GEARCA/Mecanica 200 Taco was carried out with complicity and fraudulent misrepresentation to the Plaintiff of the facts surrounding the fraud. This fraudulent misrepresentation affected the Plaintiff and the customers of the Plaintiff, with losses for end customers running into millions of dollars and for Plaintiff running into at least 350,000,oo USD in the case of the GEARCA(Mecanica 200 Taco case, 100,000,oo USD for commissions and over 250,000,oo USD on third party equipment loss of sales.

135.    The Plaintiff suffered all sorts of damages and injuries by relying on the fraudulent misrepresentations of the Defendants.

**136.    Conversion**

137. The Defendant deprived the interest of the plaintiff in property through unauthorized acts and causing losses. The Defendant seized, took possession of, machinery, etc. it was not entitled to.  The default remedy is the damages, considering the fair market value of the property or returning the properties. Chapter IV of the Venezuelan Code of Commerce  and the corresponding Swiss Code of Obligations for commercial agency and sales contracts.

**138. Negligence and Bad Faith**

139. The Defendants had legal duties with respect to the Plaintiff and the rights of Plaintiff  as set forth in Venezuelan Law, Swiss Law, U.S. Law and International Treaties subscribed by Venezuela, Switzerland and the United States;

140. Defendant failed to honor its duties with customers, fiduciary duties (embezzlement of Good faith consignments),

141. Plaintiffs suffered great damage by actions of Defendant;

142. The Failure to perform a number of duties  by Defendants result in this Cause of Action.

143. Intentional Torts: Plaintiff suffered the  deliberate actions taken by DMG America, DMG Pfronten and other DMG Subsidiaries that caused harm

to them and their property. In the case of  Plaintiff the following torts can be asserted:

**144. THIRD CAUSE OF ACTION - Precedent causes of action**

145. Plaintiffs respectfully  ask the court for an extension to provide Precedent causes of action at a later date.

**146. FOURTH CAUSE OF ACTION (Equity-related causes of action)**

**147. For unjust enrichment**

148. Defendants profitted  from appropriation of money from the Plaintiff and the assignors to the Plaintiff.

149. The Plaintiff seeks compensation for the injuries inflicted by the Defendants.

**150. Violation of Code of Commerce (Venezuela 1955): Provisions for agents.**

**151. Violation of Code of Commerce (Switzerlan) Provisions for agents.**

152. In order to be able to fulfill the agency duties, Plaintiff  undertook a large number of international trips from Venezuela to Switzerland, and to Germany to meet with DMG management and discuss how to rectify DMG's misconduct. This involved several trips from Venezuela to Brazil and the United States of America. In several cases, these travel expenses related to clients of Mr. Jorge Alejandro Rodriguez. On some of these

trips, due to the complexity of the issues discussed, Mr. Jorge Alejandro Rodriguez had to pay for the travel expenses of sales representatives and technicians traveling with him. These expenses are to be paid to Plaintiff according to the federal law of the Venezuelan Code of Commerce and the Swiss Civil Code, Art. 418.

153. The Plaintiff alleges that DMG Mori actions violated Plaintiff agency contracts, as well as the laws of Switzerland, the Republica Bolivariana de Venezuela, the United States and international treaties (United Nations on Trade, the Rome Convention, the Lugano Convention and others) which bound these countries. The Plaintiff deserves damages for lost benefits, loss of sales and other losses. Also deserves to have compensation as Defendants enjoined from continuing to violate the rights of the Plaintiff. The Plaintiff is likely to succeed in the case. Plaintiff has a strong case, and the law is on his side.

**154. FRAUDULENT CONCEALMENT**

155. Defendants deprived Plaintiff of access to all documentation and evidence they were entitled. Defendants systematically denied access to all type of electronic media to Plaintiffs. Defendants erased, deleted, blocked and performed other similar activities in order to delete or eliminate sources of evidence including those in electronic media.

156. In the case of the GEARCA/Mecanica 200 Taco DMG fraudulently concealed the facts of the case and caused injuries to the customer and the Plaintiff.

157. While the abusive actions were performed, DMG repeatedly, including through two then Presidents or Co-Presidents of DMG America maintained that "a satisfactory solution would be found".

158. In addition, Plaintiff on the recommendation and promise of future DMG Mori service and repair business, purchased several machines manufactured by DMG Mori from private vendors in order to increase sales of spare parts, accessories and various services offered by DMG Mori. As DMG Service concealed and fraudulently increased prices to Plaintiff a number of times, it became impossible for Plaintiff to perform the offered services to the customers in the terms agreed with customers due to DMG Mori bad faith or negligence.

159. The actions, omissions and other mischievous and clearly planned and orchestrated behaviours of DMG Executives **Rajeev Anand, Decio Lima, Henri Gouffaux, Thorsten Schmidt and Rainer Keller - were** instrumental for the execution of fraudulent concealment

**160. DAMAGES**

161.    The Plaintiffs hereby adopt, restate, and relate each and every paragraph above as if fully set forth herein.  Defendants actions and omissions, as set forth above, proximately caused injuries to the Plaintiffs which resulted in the following damages for which the Plaintiffs are entitled to reasonable and proper compensation:

162.    That Plaintiff be compensated in an amount to be determined in the amount of the losses arising from the contracts, the unfulfilled contracts or orders.

163.    That the machines related to the unfulfilled contracts with Mr. Jorge Alejandro Rodriguez be delivered as originally agreed or a flat compensation of the full contracted amount of the equipments, of about 1,950,000,oo USD be paid to Plaintiff

164.    That the damage caused to Plaintiff for the increase by DMG MORI of the agreed and contractually agreed sale price of a CTX machine, as well as the damage of 5,000 USD for the machine that was delivered without manuals and with functional problems. This amount be paid to Plaintiff. This amount if of about 135,000,oo USD.

165.    That Plaintiff be compensated for having received a faulty and wrongly used machine instead of the one ordered, working and unused. This amount is of about 157,000,oo USD.

166.    That Mr. Jorge Alejandro Rodriguez be compensated by DMG MORI for the loss of sales of systems and also for the loss of sales commissions supplied by Mr. Jorge Alejandro Rodriguez as an integral part of the delivery of the machine to customers. This amount is of about 220,000,oo USD.

167.    That the expenses of the business and travel expenses related to the business and sales lost by the wrongdoings of DMG Mori be paid to Plaintiff. This amount is of about 140,000,oo USD.

168.    That the expenses of the business and travel expenses related to the training of technical and commercial personnel by Plaintiff with regards to the equipments to be manufactured by and sold as agent of DMG Mori be paid to Plaintiff. These seminars and training courses took place in Germany, Switzerland, Brazil, the USA and China. This amount is of about 72,000,oo USD.

169.    That Mr. Jorge Alejandro Rodriguez be reimbursed for the legal and ancillary costs incurred through the fault of DMG Mori in an amount to be determined. This amount is of about 74,000,oo USD.

170.    That Mr. Jorge Alejandro Rodriguez be compensated for the injuries to his reputation in the industrial and commercial community in Venezuela due

to the misconduct and misrepresentations committed by DMG Mori in an amount no less than 120,000,oo USD.

171.   That according to the provisions of the Venezuelan Civil Code and the Swiss Civil Code, in particular the provisions in Articles 418 to 424, for the loss of sales in the countries, for the costs and expenses of the representation, for the inability to work (Art. 418m). The amount of this compensation has not yet been determined.

172.   Due to the non-competition clause agreed between DMG Mori and Mr. Jorge Alejandro Rodriguez, the unilateral de facto termination of the commercial agency contract by DMG Mori, Mr. Jorge Alejandro Rodriguez has an inalienable right to an appropriate special remuneration (Art. 418d ZGB). This amount has not yet been determined.

173.   Due to the unilateral termination by DMG Mori, Mr. Jorge Alejandro Rodriguez lost profits, since several sales of machines to end customers were already planned for the next year and these could not be carried out due to the termination. Because of this, Jorge Alejandro Rodriguez has suffered a lost profit. This amount has yet to to be determined.

174.   The amounts claimed are nominal and relate to different currencies and times and the court is hereby politely requested to allow the proper financial calculations in relation to exchange rates, the value of money

over time, inflation, accrued interest and other customary adjustments. This amount has not yet been determined.

175. everything under cost and compensation consequences at the expense of Defendants and DMG Executives.

176. Past and future pecuniary loss; and attorneys' fees .

177. Plaintiffs seek to recover pre-judgment and post-judgment interest at the statutory rate or at such other rate as is set by this Court.

178. Plaintiffs seek all damages they are entitled to under the law, whether pled or not. This includes exemplary damages whereby exemplary damages caps do not apply according to Delaware Civil Code .

179. Plaintiffs ask for damages to be awarded to the under the common law and other statutes of the State of Delaware, such damages to  treble the amount of the damages proved.

**180. JURY TRIAL DEMAND**

181. Pursuant to the provisions of  FRCP Rule 38. Right to a Jury Trial and of Illinois Rules Civil Procedure Super. Ct. 38 and 39, Plaintiffs formally make this demand and application for a jury trial in this lawsuit. Plaintiff hereby demands trial by jury for all causes of action, claims or issues in this action which are triable as a matter of right to a jury.

**182. PRAYER FOR RELIEF**

183.   For the foregoing reasons, the Plaintiffs respectfully request from the Court:

184.   That the Court determine that Plaintiffs have right to bring this action for the claims alleged by the and that judgment be entered in favor of Plaintiffs and against Defendant;

185.   That Plaintiffs damages be declared as preferential in all collection proceedings, including attachments, bankruptcy and similar.

186.   That Plaintiff be awarded damages, in an amount according to injury;

187.   That Plaintiffs be awarded restitution and damages, including disgorgement of profits obtained by Defendant as a result of their acts of unjust enrichment, or any acts in violation of laws of fiduciary duties;

188.   That Defendant, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein; or from entering into any other conspiracy alleged herein, or from entering into ·any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or

following any practice, plan, program, or device having a similar purpose or effect;

189. That Plaintiffs be awarded proper interest for damages after the date determined by the court;

190. That Plaintiffs recover their costs of suit and reasonable attorney's fees; and

191. That the Court grant other legal and equitable relief as it may deem just and proper under the circumstances, including such other relief as the Court may deem just and proper to redress, and prevent recurrence of, the alleged violation to dissipate the effects of Defendant's violations.

192. Order Defendants to pay damages to Plaintiff in an amount to be determined during the process; and grant such other relief as the Court may deem just and equitable.

193.   Respectfully submitted,



**Jorge Alejandro III RODRIGUEZ MORENO**

## **PROPOSED ORDER**

## **IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT**

## **OF ILLINOIS**

| |
|---|
| **Jorge Alejandro III RODRIGUEZ MORENO** |
| **Referred to as "Lead Plaintiff" or "Plaintiff"** |
| **Plaintiff,** |

**v.**        **Case No:**

| | |
|---|---|
| **DMG AMERICA INC.** | **COMPLAINT FOR** |
| **DMG MORI AMERICAS HOLDING** | **BREACH OF** |
| **CORPORATION** | **CONTRACT,** |
| **DMG MORI USA, INC.** | **FRAUDULENT** |
| **DMG MORI USA SALES, INC.** | **CONCEALMENT,** |
|     **Collectively "DMG Mori" , "Defendant"** | **UNJUST ENRICHMENT** |
| **or "Defendants"** | **AND OTHER CAUSES.** |
| **Collectively "DMG Mori Executives","DMG** | |
| **Executives" or "Executives"** | |
| | |
| **Defendants** | |

## **PROPOSED ORDER**

Upon initial revision of complaint, taken into account the facts and circumstances presented by Plaintiffs, this Court rules,

194.    The Plaintiffs have a right to bring this action;

195.    The complaint is NOT DISMISSED and service of process shall issue.

196.    That Plaintiffs damages and awards might be declared as preferential in all collection proceedings, including attachments, bankruptcy and similar.

197.    Interim Injunction, the Court adjudges and decrees that Defendant's contract, conspiracy, or combination constitutes an illegal restraint of worker rights.

198.    Interim Injunction, Court enjoins Defendants from continuing to violate the Plaintiffs' rights so that Defendant, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein; or from entering into any other conspiracy alleged herein, or from entering into ·any other contract, conspiracy or combination having a similar purpose or effect,

## **PROPOSED ORDER**

199.   and from adopting or following any practice, plan, program, or device

having a similar purpose or effect;

200.    Court grants *Plaintiffs* to seek discovery from the Defendants and

counsel,

201.   Court orders Defendants and Plaintiff to arrange for a mediation meeting

under the rules of this court, no later than the 30th of June, 2024; all

expenses involved in attendance and preparation of mediation in charge

to Defendants.

**Attachment I**

**Identification and standing of Plaintiffs.**

> **Jorge Alejandro RODRIGUEZ - Plaintiff - Lead Plaintiff -** Plaintiff, of older age and legally capable, currently domiciled in Europe  is a Venezuelan citizen with the following qualifications: Holds an Electrical Engineering  Degree in the field of Electrical Power Systems issued by the Armed Forces Polytechnic Institute (IUPFAN, Venezuela, 1987); holds a Magister Scientiarum (MSc) from Instituto de Estudios Superiores de Administración, IESA, in Caracas; holds a Masters Degree in International Business from Tulane University in New Orleans; holds a Certificate of Advanced Studies from the Federal Institute of Science and Technology (ETH Zürich, Switzerland), has filed actions in the Electoral Tribunal of the Venezuelan Supreme Court against rulings taken by he Venezuelan Electoral Authority that favored the government of deceased Hugo Chavez (2004), i.e. actions against Hugo Chavez government; has directed or participated in different NGOs opposing the government of Hugo Chavez and Nicolas Maduro dating back to the first election of Hugo Chavez in 1998; Mr. **Lead Plaintiff**  has been the promoter of CLIPP also known as Comité por la Libertad de los Presos Políticos (Committee for the Freedom of Political Prisoners) since 2004, an

50

association of venezuelans that has worked to promote the well being of Venezuelans imprisoned for political reasons since 2004, and participated in a number of other non partisan NGOs; has filed in Venezuela Attorney General's Office requests against several ministers and high ranking officers of Hugo Chavez. Mr. **Lead Plaintiff** is a known person in the Venezuelan industrial, energy and political sector. Mr. **Lead Plaintiff** is currently in exile and an elected (unsworn due to risk of life reasons) Member of Venezuelan Parliament, under the protection of Switzerland since 2019.

**Lead Plaintiff has for many years been representative to the Swiss Venezuelan Chamber of Industry and Commerce, delegate to the Energy Policies Committee of the Venezuelan Congress, a recognized business person in the metalworking machinery industry in Venezuela.**

## Attachment II

## Itinerary of one of several visits of the CEO of DMG America Mr. Henry Goffaux to MPlaintiff and customers in Caracas.

**Itinerary confirmed for DMG Mr H Goffaux by CMS Jorge Rodriguez by email for visit August 2009.**

Itinerario Venezuela Henry Goffaux
Jorge Rodriguez
16/08/09
para henry.goffaux

Saludos Henry, confirmamos el itinerario para tu estimada visita:
Hotel:
Hotel JW Marriott, Av. Venezuela de El Rosal, Caracas.
Reservacion a nombre de H. Goffaux efectuada por Jorge Rodriguez
Tlf:
Itinerario:
Lunes17 llega 17:05hs Maiquetia, hora estimada llegada a Caracas 19:00 hs.Un taxi de protocolo del hotel estará esperándole en el aeropuerto. Ellunes a primera hora nos suministrarán la confirmacion respectiva en elhotel.  Cena ligera con Jorge Rodriguez.
Martes 17:   8:00 am  Desayuno con personal deGearca
                9:00 am  Visita a entidad gubernamental con personal de Gearca.
                10:30 am  Visita a Gearca
            12:30  pm  Salida a Turmero-Maracay  Cliente Herreplast
                13:00 pm  Comida en el camino
                02:15 pm   Reunion cliente Herreplast (Alberto Pares acompaña)
                04:45 pm   Reunion Danaven (Alberto y Victor)
                06:00 pm   Visita oficina Valencia (Alberto, Victor y Carlos)
Miercoles 18:  Opcion Visita Inmero C.A.  - Valencia
                 Opcion Visita Partes Industriales C.A.  -  Valencia
                 Reunion Jorge Rodriguez


Cordiales saludos,


Jorge


Jorge A. Rodriguez M.
17/08/09
para henry.goffaux, renato.rodrigu.

Saludos Henry,
Al salir de la zona de equipajes si miras a tu izquierda veras varios pequenos locales, uno de ellos identificado con el nombre de " Taguaqui Tours" en el cual te identificas con tu nombre y que tienes la reserva en el Marriott de Caracas.  Ellos tienen tu reserva y vehiculo preparado. De alli te van a escoltar hasta el automovil que te trasladara directamente al hotel.
Aprecio me contactes por el +584242597050  o por el 04242597050   dependiendo del sistema de tu

**Attachment II**
**Contract CTX-310V1 Eco SN 8044000250E PO D-161.zip**

Entre DMG AMERICA INC, sociedad constituida y domiciliada en los Estados Unidos de Norteamérica, inscrita por ante el Estado de Delaware, debidamente representada en este acto por el señor Decio de María Lima Filho, de nacionalidad Brasilera, mayor de edad, identificado con pasaporte No. CZ115042, domiciliado en Rua Dr. Luiz Migliano N°173, Sao Paulo, Brasil, quien actúa en su carácter de Presidente para Latinoamérica, debidamente facultado por "Unanimous Written Consent of The Board of Directors in Lieau and Special Meeting", de fecha 29 de julio de 2010, parte que en lo sucesivo y para los efectos de este documento se denominará "LA VENDEDORA", en primer lugar; y, por la otra, la sociedad mercantil INCCTI, C.A., constituida y domiciliada en Caracas, República Bolivariana de Venezuela, inscrita por ante el Registro Mercantil Quinto de la Circunscripcion Judicial del Distrito Capital y Estado Miranda, Tomo 1700ª, Numero 17, identificado con el R.I.F. Nro. J-2951192-4, representada en este acto por su Gerente General Alberto Jose A. Pares Freites, venezolano, mayor de edad, domiciliado en Valencia y titular de la cedula de identidad C.I V-6.975.228, facultado por los estatutos sociales de la mencionada sociedad, parte a la que en lo sucesivo y para los efectos de este documento se denominará "LA COMPRADORA", en segundo término; y, en tercer lugar, el señor Jorge Alejandro Rodriguez, venezolano, mayor de edad, identificado con la Cédula de Identidad Nro. V-8.665.622, con domicilio en Caracas, Distrito Capital, quien interviene en este acto para efectos de constituirse en forma expresa, inequívoca e irrevocable, en "FIADOR SOLIDARIO", denominación que en este documento en lo sucesivo se referirá a su persona; se ha convenido en celebrar un CONTRATO DE

18·11·10  3
6270 95

DE COMPRAVENTA DE MÁQUINAS, de acuerdo a los términos y condiciones contenidos en las siguientes cláusulas:

PRIMERA.- LA VENDEDORA es propietaria de 01 máquina (LA MÁQUINA), cuyo detalle y especificaciones se encuentran en el Anexo Nº01 del presente instrumento, mismo que, debidamente suscrito, forma parte integrante y constitutiva del presente documento.

SEGUNDA.- Mediante el presente instrumento, LA VENDEDORA da en venta a LA COMPRADORA, la máquina cuyo detalle y especificaciones se encuentran en el Anexo Nº01 del presente contrato, por la suma de US$67,000.00 (Sesenta y siete mil exactos Dólares Americanos), que LA COMPRADORA paga con una cuota inicial del 10% para lo que en términos de comercio internacional usuales se denomina "Booking of Machine", 10% con la instrucción de entrega y el saldo en un pago único a 180 días de la fecha CIF Venezuela, pago sin necesidad de requerimiento previo, en el domicilio de LA VENDEDORA.

En garantía del pago oportuno del saldo de precio, LA COMPRADORA se obliga a aceptar una letra de cambio que será librada por LA VENDEDORA, para ser pagada a ciento ochenta (180) días vista, sin aviso y sin protesto, a favor del FIADOR, quien a su vez se obliga a endosar dicha letra por valor en garantía, de conformidad con lo establecido en el artículo 427 del Código de Comercio, a favor de LA VENDEDORA.

La oportunidad en que la mencionada letra será presentada a LA COMPRADORA para la aceptación, será dentro de los tres (3) días hábiles siguientes a la fecha CIF Venezuela.

En caso ocurra el incumplimiento de una de las obligaciones previstas en esta cláusula, LA VENDEDORA podrá dar por vencidos en forma anticipada todos los plazos del presente contrato y por lo tanto, tendrá expedito su derecho de exigir el pago total de las sumas adeudadas por concepto de capital y de intereses, compensatorios y moratorios. LA VENDEDORA declara haber recibido a su satisfacción el monto de USD 6.700,00 (Seis mil setecientos dólares americanos exactos) por crédito a su cuenta, que cubren en su totalidad los montos de "**10% para lo que en términos de comercio internacional usuales se denomina "Booking of Machine"** " antes mencionado. A los efectos de autenticación las partes declaran que esta máquina esta amparada bajo el Codigo Arancelario: 84.58.11.10 correspondiéndole una tasa cambiaria de 2,60 BsF por Dólar Americano según el convenio cambiario vigente, de forma tal que el monto para efectos de registro y en cumplimiento de lo dispuesto por la Ley del Banco Central de Venezuela, es de 174,200.00 BsF (Ciento setenta y cuatro mil doscientos 174,200.00 BsF). LA COMPRADORA podrá en cualquier momento antes del vencimiento de la obligación efectuar el pago de la misma.

TERCERA.- Los contratantes declaran que actúan en este contrato con plena libertad, que conocen los bienes materia de venta y que entre éstos y el precio pactado, existe la más justa y perfecta equivalencia, declarando que si hubiera alguna diferencia que en este acto no perciben, se hacen de ella mutua gracia y recíproca donación. La venta tiene el carácter de *ad corpus*.

CUARTA.- LA VENDEDORA mantiene la propiedad de la máquina materia del presente instrumento, hasta que LA COMPRADORA haya cancelado la totalidad del precio de venta pactado en el presente instrumento legal, sin más

constancia de lo acordado en la presente cláusula, que la propia suscripción de este documento.

QUINTA.- LA VENDEDORA declara que sobre la máquina que vende, no pesan gravámenes, cargas, embargos y/o medidas judiciales, extrajudiciales o contractuales, que afecten los mismos y/o la transferencia de éstos.

SEXTA.- LA VENDEDORA podrá dar por vencidos en forma anticipada todos los plazos del presente contrato y por lo tanto, tendrá expedito su derecho a exigir el pago total de las sumas adeudadas por concepto de capital y de intereses, compensatorios y moratorios y demás gastos, servicios e impuestos, si es que LA COMPRADORA incurre en uno cualesquiera de los siguientes casos:

6.1 Si LA COMPRADORA es declarada en quiebra, insolvencia, o se le siguiese un concurso de acreedores.

6.2 Si ocurre cualquier circunstancia extraordinaria que dificulte que LA COMPRADORA pueda cumplir con las obligaciones establecidas en este contrato o que impidan satisfacer los propósitos que se tuvieron en cuenta a celebrarlo.

6.3 Si el bien materia del presente contrato se hubiesen depreciado c deteriorado a punto tal que se encuentre en peligro la cobranza de lc adeudado.

6.4 Si el bien materia del presente instrumento, hubiesen sido embargados poi un tercero.

6.5 Si LA COMPRADORA es demandada respecto a la propiedad de los bienes materia del presente contrato.

6.6 Si por cualquier título, LA COMPRADORA cede la posesión de los bienes otorgados en venta, antes de su cancelación total, sin recabar la conformidad expresa y por escrito de LA VENDEDORA.

6.7 Si LA VENDEDORA detectase falsedad en la información suministrada por LA COMPRADORA en su solicitud de compra y/o en cualquier otra documentación presentada.

6.8 Si el FIADOR SOLIDARIO deviniera al estado de insolvencia, salvo que LA COMPRADORA presente a otro u otros fiadores que reúnan las cualidades exigidas por las leyes Venezolanas.

En cualquiera de los casos señalados en esta cláusula, así como en los previstos en la cláusula segunda que antecede, LA VENDEDORA podrá solicitar a LA COMPRADORA que le deposite el importe en efectivo de su responsabilidad total independiente y si no cumpliera con hacerlo dentro de las 48 horas de notificado a tal efecto, notarialmente o por cualquier medio, LA VENDEDORA notificará en tal sentido al FIADOR SOLIDARIO.

SÉPTIMA.- LA COMPRADORA se obliga a asegurar contra todo riesgo LA MÁQUINA por la suma de la venta pactada a satisfacción de LA VENDEDORA, a partir de la fecha en que entre en posesión de la misma. Así mismo, LA COMPRADORA se obliga a endosar las respectivas pólizas y sus renovaciones a favor de LA VENDEDORA con el fin de que ésta pueda cobrar directamente el seguro en caso de siniestro y aplicarlo al pago de las mismas obligaciones que dicho bien garantiza, sin que pueda imputársele responsabilidad alguna por la liquidación de las pólizas y sin perjuicio de hacer valer su derecho por el saldo que quedase pendiente.

Si LA COMPRADORA no cumpliera con asegurar LA MÁQUINA, LA VENDEDORA podrá suplir esta omisión en la medida que convenga a su derecho y lo que por tal concepto gastase será de cargo de LA COMPRADORA.

En caso que LA VENDEDORA procediera a la ejecución o cobro de la póliza respectiva como consecuencia de un siniestro, LA COMPRADORA y EL FIADOR SOLIDARIO se obligan solidariamente frente a LA VENDEDORA a asumir íntegramente el pago de cualquier suma de dinero por concepto de franquicia y gastos que deduzca la Compañía de Seguros. Asimismo, en caso que la indemnización pagada por el seguro por la pérdida de LA MÁQUINA sea una suma mayor a la adeudada por LA COMPRADORA, LA VENDEDORA se obliga a entregar la suma excedentaria a aquélla.

OCTAVA.- EL FIADOR SOLIDARIO garantiza todas y cada una de las obligaciones que asume LA COMPRADORA en el presente contrato y entre sí frente a LA VENDEDORA, sin reserva ni limitación alguna, para garantizar todas las obligaciones que LA COMPRADORA haya asumido por este instrumento frente a LA VENDEDORA. EL FIADOR SOLIDARIO renuncia al beneficio de la excusión.

NOVENA.- LA VENDEDORA garantiza las máquinas materia del presente contrato, por un período de dieciocho meses a partir de la presente o quince meses de la fecha CIF Puerto Venezolano, lo que ocurra primero, en condiciones normales de uso, contra cualquier defecto de fabricación o producción. Esta garantía no cubre daños producidos en su transporte.

DÉCIMA.- Los gastos legales, notariales y registrales que generarían la formalización del presente documento, su elevación a escritura pública y su

inscripción en los registros públicos, serán asumidos en exclusividad por LA COMPRADORA.

DÉCIMO PRIMERA.- Los contratantes señalan como sus domicilios válidos los indicados en ésta cláusula, donde se efectuarán todas las comunicaciones a que haya lugar. En caso de variación del domicilio indicado por cualquiera de las partes contratantes, esta solo tendrá vigencia desde la recepción de la comunicación notarial que a tal efecto curse. Dichas direcciones son:

LA VENDEDORA: 2400 Huntington Blvd. Hoffman Estates, IL 60192, Estados Unidos.

LA COMPRADORA: Paseos Las Industrias #76 Avenida Henry Ford, Z.I.M. Norte, Valencia, República Bolivariana Venezuela.

EL FIADOR SOLIDARIO: Torre Cemica Oficina 13-E, Piso 13, Av Francisco de Miranda, Chacao, Caracas 1060.

DÉCIMO SEGUNDA.- Todas las desavenencias o controversias que pudieran derivarse de este contrato, incluidas las que se refieran a su nulidad o invalidez, serán resueltas mediante laudo definitivo e inapelable, de conformidad con los reglamentos de la Cámara de Comercio de Caracas, Venezuela, a cuyas normas y administración las partes se someten en forma incondicional, declarando conocerlas y aceptarlas en su integridad. En señal de conformidad con el tenor del presente documento, las partes lo suscriben, LA COMPRADORA y el FIADOR SOLIDARIO en dos originales, en la ciudad de Caracas, a la fecha de su presentación; y LA VENDEDORA en su domicilio. Es pacto expreso entre las partes que LA VENDEDORA suscribirá el presente acuerdo entre las partes antes de treinta días continuos a partir del otorgamiento del mismo por LA COMPRADORA y el FIADOR SOLIDARIO y en

caso contrario se extinguirán las obligaciones de LA COMPRADORA y el
FIADOR SOLIDARIO explanadas en el presente contrato.

.................................................          ................................................
                LA VENDEDORA                                          LA COMPRADORA

                                    ................................................
                                          FIADOR SOLIDARIO